451 A.2d 4

## COMMONWEALTH of Pennsylvania

v.

**Ronald L. BERRY, Joseph H. Bogart, John E. Green, Ronald L. Berry, Terry L. Benshoff, James S. Keller, David C. Shoemaker, Appellants.**

Superior Court of Pennsylvania.

Argued Feb. 19, 1981.

Filed Sept. 24, 1982.

Michael H. Collins, Williamsport, for appellants.

Kenneth D. Brown, District Attorney, Williamsport, submitted a brief on behalf of Commonwealth, appellee.

Before PRICE, MONTEMURO and VAN der VOORT, JJ.

MONTEMURO, Judge:

Appellants were convicted by a magistrate of a violation of Section 4901(a) of the Motor Vehicle Code, exceeding the maximum gross permissible weight of a vehicle. Appellants were truck drivers employed by Milk Tank Lines, and each was arrested while operating a truck in the course of his employment for that company. Their convictions were affirmed on their appeals to Common Pleas Court. Because of the factual similarity and identical issue in the cases, the trial court considered all of the cases in a single opinion and order.[1] The sole issue presented to us now on appeal is

1. Post-trial motions to the Common Pleas Court were not filed. Since the decision in *Commonwealth v. Koch,* 288 Pa.Super. 290, 431 A.2d 1052 (1981), the filing of post-trial motions from the dismissal of

whether adequate grounds existed to permit the police officers in question to stop and weigh the particular commercial vehicle on each occasion. Appellants contend that the lower court erred in applying the "reasonable and articulable suspicion" standard, instead of a probable cause standard in ruling on the legality of the "stops" of the vehicles. For the reasons set forth below, we agree with the trial court and affirm.

A short recitation of the facts surrounding each of the stops is necessary. Trooper Charles Fama of the Pennsylvania State Police was the arresting officer in four of the seven cases. The first incident involved appellant Ronald Berry. Trooper Fama was stationed at the top of a ramp leading to the northernmost point of the beltway which bypasses the City of Williamsport. The trooper had his cruiser located so as to be able to see at least the top of the approaching truck for a distance in excess of one quarter mile. He was also in a location from which he could observe the speed of the vehicle as it came up the incline of the ramp. He stopped the truck because it was "pulling very hard" and having a "tough time" making the grade. From his experience in observing over one thousand trucks at that site, he concluded that unless the truck was overweight, it would not have had such difficulty in making the grade. Also, the officer knew from prior conversations with drivers from Milk Tank Lines that the drivers would not operate the tank trucks unless they were full. The trucks were not equipped with baffles; and, therefore, if the trucks were partially full, the milk contents would splash and create a hazard to the drivers. The officer concluded from his knowledge of the capacity of the tank, the weight of milk, and the weight of the truck, that if the tanks were filled to capacity, it would exceed the maximum gross weight.

The next two cases involved appellants Bogart and Green. Trooper Fama stopped Green after he came up a ramp.

summary appeals has been made mandatory. However, since the dismissal of the summary appeals in these cases occurred before the *Koch* decision, the appeal is properly before us.

While there, he observed Bogart coming up the ramp and he stopped him also. The trooper stopped Green because he observed milk spilled from the hatch on the top of the tank. When the truck was stopped, he observed that the milk that had spilled was still wet, indicating that the tank was full. The other consideration was again the trooper's prior conversations with the truck drivers from that company. There was no observation that the trucks were laboring up the grade or any observation of spillage from the truck operated by Bogart.

The next instance again involved appellant Berry. Trooper Fama was located at the same vantage point near the intersection of the ramp and the beginning of the Williamsport bypass. On that day, he was making a systematic check of all large trucks. From his vantage point, he could see an intersection to the north where trucks would enter a bypass or proceed into the city of Williamsport. He had seen Milk Tank Line trucks on a daily basis and had never seen one go through the streets of Williamsport. It was his suspicion that the driver was trying to avoid the location of the weight check. He radioed a mobile weight unit and requested them to follow him until he could effectuate a stop. After losing sight of the truck, he eventually sighted it and followed it through the city and into the suburbs where he eventually stopped it. While following the truck, he observed that the tires were bumping together, a sign indicative of excess weight on the rig. He stopped the rig because of the condition of the tires, because he believed the driver evidenced a guilty mind by avoiding him, and because on that day, he was making a systematic check.

The next three cases involved a stop by Trooper Charles Snyder of three trucks that were driving together, and driven by appellants Benshoff, Keller and Shoemaker. Trooper Snyder was operating a weight check at the intersection of Pennsylvania Route 87 and U.S. Route 220 in the Borough of Montoursville. After the three Milk Tank Line Trucks passed his location, the officer pulled out and followed them up a ramp. He noted that their speed was very

slow, and they were "pulling hard" and emitting heavy smoke. He also noted that the tires in each of the three vehicles were bulged, indicating that the trucks were carrying excessive weight. Based on these criteria, he stopped the vehicles. Trooper Snyder had never before stopped a Milk Tank Line truck and had not spoken previously with any of its operators.

■ It is clear that when a police officer stops a vehicle, such stop constitutes a search and seizure under the Fourth Amendment. *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1970). The Fourth Amendment protects individuals from unreasonable invasions of their privacy. Necessarily, this expectation of privacy varies according to the location of the search, the extent of the search, the time of the search, and the governmental interest in executing the search. See *Delaware v. Prouse, supra, Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), *Frank v. Maryland,* 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). Individuals in motor vehicles have a lesser expectation of privacy than individuals in their personal residence. *Chambers v. Maroney, supra.* The fact that property which is subject to a search is government regulated, does not destroy all expectations of privacy. *Camara v. Municipal Court, supra, See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), see also *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). However, the extent of government regulation is a factor in determining the propriety of a search. The cases before us deal with the stopping of commercial vehicles.

Case law from the Pennsylvania Appellate Courts and the U. S. Supreme Court have recognized the "reasonable and articulable suspicion" standard as the basis for stopping a

private motor vehicle.[2] See *Delaware v. Prouse, supra, Commonwealth v. Ferraro,* 237 Pa.Super. 268, 352 A.2d 548 (1975), *Commonwealth v. Nastari,* 232 Pa.Super. 405, 335 A.2d 468 (1975).

The "reasonable and articulable suspicion" standard was first articulated in *Terry v. Ohio, supra.* In that case, the court noted that a dual inquiry was necessary in determining the reasonableness of a search; "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* 392 U.S. at 20, 88 S.Ct. 1868, 20 L.Ed.2d 889. The court, in order to determine whether the justification of the search was proper, enunciated the following test:

. . . it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seizure] against the invasion which the search [or seizure] entails.

Id. at 391–392, 88 S.Ct. at 1868, 20 L.Ed.2d 889 (Citations Omitted).

In *Terry,* the court recognized that a police officer could constitutionally "stop" a pedestrian for investigatory purposes on facts amounting to less than probable cause and "frisk" the individual for the limited purpose of police safety in discovering a weapon.

**2.** In *Commonwealth v. Swanger, supra,* the Pennsylvania Supreme Court apparently enunciated a probable cause standard for stopping an automobile. However, in that case the police stopped a car which exhibited *no* outward sign of *non*-compliance with the Motor Vehicle Code. The court based its decision on the absence of any reasonable and articulable facts that would warrant an intrusion. The court, in note 3, specifically excluded systematic stops or roadblocks from its holding. Since *Swanger,* Pennsylvania courts have interpreted that case to allow a stop on facts amounting to less than probable cause. See *Commonwealth v. Nastari, supra, Commonwealth v. Ferraro, supra.* The rationale of the stops is consistent with the holding in *Terry v. Ohio, infra* (stop and frisk of pedestrians).

14 

Although the facts and the ultimate holding in that case vary from the case presently before us, the underlying rationale is nevertheless applicable.[3]

█ When we balance the privacy rights of the truck operators against the expressed governmental interest in maintaining safe highways, we hold that under the facts of these cases, the stopping and weighing of these vehicles was constitutionally permissible. The stops were based on specific and articulable facts and the weighings are in and of themselves a minimally intrusive type of search. Trucks are subject to greater governmental regulations than automobiles because of their obvious burden and heightened danger to the highways. Police officers would effectively be precluded from enforcing the law if they were merely allowed to stop the vehicle without weighing it in situations in which all trucks were not being stopped. Also, the stops were not totally non-discretionary acts, subject only to the whim of the officers.[4] See, *U. S. v. Harper,* 617 F.2d 35 (4th Cir. 1980), see also *Delaware v. Prouse, supra.*

We emphasize that our holding today does not endorse a full search of a commercial vehicle. The scope of the search is limited to the minimal intrusion of weighing the vehicle.

**3.** *Terry* involves a frisk after a stop. Our case involves a weighing after a stop.

**4.** In the case before us there are reasonable and articulable facts justifying the stopping and weighing of the vehicles. The legislative act authorizing this procedure, 75 Pa.C.S.A. 4981, imposes no restraint on officers in the stopping and weighing of vehicles. In *Delaware v. Prouse, supra,* the U. S. Supreme Court, while condemning purely random stops of private automobiles, stated "nor does our holding today cast doubt on the permissibility of a roadside truck weigh station and inspection checkpoints at which some vehicles may be subject to further detention for safety and regulatory inspections than are others" *Id.,* 440 U.S. 648, at 663, 99 S.Ct. 1391, at 1401, 59 L.Ed.2d 660 footnote 26. While we conclude that there were reasonable and articulable facts justifying the stops, we also note that three stops by Trooper Snyder are alternately justifiable as systematic stops under *Commonwealth v. Swanger, supra* and *Delaware v. Prouse, supra.* The constitutionality of totally random stops is not now before us.

For the foregoing reasons, we conclude that the dismissal of the summary appeals was proper.

Accordingly, judgment of sentence is affirmed.